# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KRISTIN KATHERINE BAISCH RICKER, on behalf of herself and others similarly situated<br><br>    Plaintiff,<br><br>  vs.<br><br><br>DEBT RESOLUTION DIRECT LLC d/b/a DEBT ADVISORS OF AMERICA<br><br>    Defendant. | Case No. 25-cv-06972 |

### PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS[1]

---

[1] The Court permitted the Plaintiff to file a brief of up to 25 pages. See ECF No. 18.

**<u>Introduction</u>**

A law enacted in 1991 that bars vehicles from a park applies equally to Cybertrucks and to sedans, even though the former didn't exist at the time. So, too, here: The Telephone Consumer Protection Act prohibits sending text messages to phone numbers on the national Do Not Call List, just as it prohibits traditional voice calls.

Text messaging didn't exist in 1991, but that doesn't matter: as both the FCC and courts have long recognized, the plain meaning of the word "call" in the TCPA encompasses any attempt to communicate by phone, "regardless of whether that call is communicated by voice or text." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009); *see* 18 FCC Rcd. 14115 ¶ 165 (2003). The TCPA's Do Not Call List rules therefore apply to text messages. *See, e.g.*, *Wilson v. Medvidi*, 2025 WL 2856295, at *2–4 (N.D. Cal. 2025); *Wilson v. Skopos Fin.*, *LLC*, 2025 WL 2029274, at *4–5 (D. Or. 2025).

The structure and purpose of the TCPA's Do Not Call List provisions reinforce that interpretation. The Do Not Call List exists "to protect residential telephone subscribers' privacy rights"—which are invaded by text messages no less than by voice calls. 47 U.S.C. § 227(c)(1); *see Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1008–09 (N.D. Ill. 2010) (St. Eve, J.). The statute directs the FCC to prohibit "telephone solicitations" to listed numbers, a term that is defined by the statute to include any "call or message … which is transmitted to any person" for a commercial purpose; that broadly inclusive language encompasses text messages even more clearly than the word "call" does standing alone. 47 U.S.C. § 227(a)(4); *see Medvidi*, 2025 WL 2856295, at *3. And the statute's Do Not Call List provisions expressly delegate "flexibility" to "fill up the details" to the FCC, which means that any doubt on this question should be resolved in favor of deference to the agency's longstanding reasonable judgment. *See*

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024); *see* 47 U.S.C. § 227(c)(3)(A), (E); *see Skopos Fin.*, 2025 WL 2029274, at *4.

Defendant's motion to dismiss argues otherwise, mainly by insisting that no one would describe a text message as a telephone "call" in casual conversation nowadays. But that's not how statutory interpretation works. Courts look to a statute's ordinary "meaning at the time of … adoption" to interpret the law, not "modern intuitions" that are often misleading when times have changed. *New Prime, Inc. v. Oliviera*, 586 U.S. 105, 114 (2019).

Defendant's argument mainly hinges on the single use of the word "call" in the provision creating a private right of action to enforce the Do Not Call List rules. Yet the company fails to explain why the reference in the private-action provision should be construed more narrowly than the Do Not Call List rules that it exists to enforce. And it also cannot explain why the word "call" would have a different meaning there than it has in the TCPA's nearby autodialer provisions. Congress used the word "call" in those provisions to describe written messages received on a pager—the most analogous technology to text messaging that existed in 1991. *See* 47 U.S.C. § 227(b)(1)(A)(iii). If a text "call" to a pager can violate the TCPA, a text "call" to a cell phone can too. *See Lozano*, 702 F. Supp. 2d at 1004–05.

Once Defendant's flawed interpretation of the statute is set straight, the analysis here is straightforward: Plaintiff received multiple unwanted marketing texts and calls from the Defendant, a company she had no relationship with, and those texts indisputably violated the FCC's Do Not Call List rules. *See* 47 C.F.R. § 64.1200(c)(2), (e). Plaintiff therefore "received more than one telephone call within any 12-month period … in violation of the regulations," and may sue to enforce his "privacy rights to avoid receiving telephone solicitations" that she has made clear she does not want. 47 U.S.C. § 227(c)(1), (5).

Furthermore, the Complaint sets forth specific, plausible facts demonstrating that Defendant initiated multiple telemarketing calls and text messages to Plaintiff Kristin Katherine Baish Ricker ("Plaintiff"), whose number had long been registered on the National Do Not Call Registry ("DNC Registry"). These allegations, taken as true, state a claim for violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, and its implementing regulations.

Section 227(c)(5) also authorizes private plaintiffs to "enjoin" violations of the Do Not Call rules. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2), (e). Plaintiff alleges a continuing telemarketing practice aimed at DNC-listed consumers, and that Defendant called again minutes after she said "do not call"—facts that plausibly show a likelihood of recurrence absent an injunction. (ECF No. 1 ¶¶ 12, 18, 28–56.) The request for injunctive relief is therefore proper at the pleading stage.

This Court should deny the motion to dismiss.

## **Factual Background**

Plaintiff lives in Ogle County, Illinois, and is the regular and sole user of her personal cell number ending in (815) XXXX, used only for personal/household purposes. She registered the number on the National Do Not Call Registry on August 15, 2005, and it has remained there since. (ECF No. 1 ¶¶ 8–12.) Defendant, a California LLC headquartered in San Diego County, markets debt-resolution services nationwide, including in this District. (Id. ¶ 13.)

On May 1, 2025, Plaintiff received three telemarketing calls within nine minutes from (815) 634-1071—at 10:14, 10:15, and 10:23 a.m.—answering the latter two. During the second call she told the caller not to contact her again; minutes later, a live representative called back, identified "Debt Advisors of America," and offered to help reduce and consolidate Plaintiff's

debt. (Id. ¶¶ 16–19.) Shortly after, Plaintiff received two text messages from (858) 365-3349 that referenced "Debt Advisors of America," thanked her "for opting in to receive SMS messages," and provided a DAA representative's contact information. (Id. ¶ 20.)

Plaintiff alleges she never provided prior express invitation or permission, nor did she request information or promotional materials. (Id. ¶¶ 25–26.) She further alleges the calls and texts were made for the purpose of advertising and marketing Defendant's services. (Id. ¶¶ 21–24.)

<u>Argument</u>

**I.     The Statute and Rules Governing the Do Not Call List**

Section 227(c) of the Telephone Consumer Protection Act empowers the FCC to decide whether to create a national Do Not Call List, and to determine the rules that will govern it. See 47 U.S.C. § 227(c)(1)–(4). The guiding purpose of a Do Not Call List is "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." *Id.* § 227(c)(1). The key operative term there is "telephone solicitations," which the TCPA defines as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods or service, which is transmitted to any person." *Id.* § 227(a)(4). As one court recently observed, that definitional language is "more concerned with the purpose of the telephone communications [that are prohibited] than the form in which those communications are transmitted." *Wilson v. Medvidi, Inc.*, 2025 WL 2856295, at *3 (N.D. Cal. 2025); *see, e.g.*, *Hulce v. Zipongo Inc.*, 132 F.4th 493 (7th Cir. 2025) (Do Not Call List liability turned on whether a text message had the requisite commercial purpose).

The statute grants the FCC broad discretion to determine the rules governing the Do Not Call List. The statute expressly empowers the FCC to make rules "that the Commission

4

determines are most effective and efficient to accomplish the purposes of this section." 47 U.S.C. § 227(c) (1)(E) (emphasis added). And it directs the FCC to evaluate alternative approaches based on open-ended criteria such as their "effectiveness in protecting … privacy rights" and their "other advantages and disadvantages." 47 U.S.C. § 227(c) (1)(A).

Any Do Not Call List regulations that the FCC establishes must meet certain statutory criteria. *See id.* § 227(c)(3)–(4). For example, the rules must require phone companies to notify their subscribers about the Do Not Call List, and must specify how frequently the list will be updated. *Id.* § 227(c)(3)(B), (I). And—as relevant here—the statute specifies that the FCC's rules must "prohibit any person from making or transmitting a telephone solicitation to the telephone number of any subscriber included in" the national Do Not Call List. *Id.* § 227(c)(3)(F).

Finally, section 227(c)(5) provides for private enforcement of the FCC's Do Not Call List rules. That provision grants an express private right of action to sue in federal court to any "person who has received more than one telephone call within any 12-month period … in violation of the regulations." 47 U.S.C. § 227(c)(5). That is "a straightforward provision designed to achieve a straightforward result"—to enable "each person to protect his own personal rights" conferred by section 227(c). *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 650 (4th Cir. 2019).

The FCC has implemented section 227(c)(3)(F) by adopting 47 C.F.R. § 64.1200(c)(2), which generally prohibits "any telephone solicitation to … [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry." The FCC has also made clear in a series of orders and, more recently, in a formal regulation that this rule applies to anyone "making telephone solicitations or telemarketing calls or text messages to

wireless telephone numbers." 47 C.F.R. § 64.1200(e); *see* 18 FCC Rcd. 14014, 14115 ¶ 165 (2003); 30 FCC Rcd. 7961, 8020 ¶¶ 115–16 (2015); 38 FCC Rcd. 12247, 12256–57 ¶ 26 (2023).[2]

Defendant contends that a single use of the word "call" in section 227(c)(5)'s private right of action means that the Do Not Call List rules cannot apply to text messages. That's incorrect. As courts and the FCC have long and recently recognized, the statute's ordinary meaning, structure, and purpose refute that argument: The word "call" as used in the TCPA refers to any attempt to communicate by telephone, so the FCC may prohibit telemarketing texts to numbers on the Do Not Call List. And because section 227(c) is structured as an express delegation of authority to the FCC, any doubt about that conclusion simply means that Congress intended the agency's reasonable judgment to control.

Courts have long recognized that the word "call" in the TCPA refers to any attempt to communicate by telephone, including text messages. That's because the "ordinary, contemporary, common meaning" of the word "call" in this context is "'to communicate with or try to get into communication with a person by a telephone.'" *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 953–54 & n.3 (9th Cir 2009) (quoting Webster's Third New International Dictionary (2002)); *Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1007 (N.D. Ill. 2010) (St. Eve, J.) (same). This basic definition of the word "call," which is the relevant one given the context and the word's pairing with "telephone" in section 227(c)(5), appears in many dictionaries from around the time of the TCPA's passage. *See, e.g.*, Webster's

---

[2] That interpretation was first announced in the context of the TCPA's nearby prohibitions on autodialed calls, found in section 227(b). See 18 FCC Rcd. at 14115 ¶ 165. But the FCC has clarified that it applies to section 227(c), too. See 38 FCC Rcd. at 12256–57 ¶ 26.

College Dictionary (1991) ("to communicate or try to communicate with by telephone"); Oxford English Dictionary, 2d Ed. (1989) ("a summons or communication by telephone").

Courts have long recognized that the definition identified in *Satterfield*—any attempt to communicate with someone by telephone—is the meaning of "telephone call" that Congress would have intended in 1991, when the TCPA was enacted. *See, e.g.*, *Ashland Hosp. Corp. v. Serv. Emps. Int'l Union, Dist. 1199 W.V./Ky./Oh.*, 708 F.3d 737, 742 (6th Cir. 2013). And texting is, of course, a means of communicating with someone by telephone. So that established definition readily encompasses texts. *See, e.g.*, *Satterfield*, 569 F.3d at 953–54; *Lozano*, 702 F. Supp. 2d at 1007; *Wilson v. Medvidi*, 2025 WL 2856295, at *2 (N.D. Cal. 2025).

That established meaning of the word "call" is especially clear in the nearby autodialer provisions in section 227(b) of the original TCPA. Absent contrary evidence, a statutory word or phrase is presumed to bear a consistent meaning across different provisions of a statute. *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 85 (2017). Here, the word "call" is used extensively in the provisions of the statute that prohibit automatic dialing technology and robocalls, which were also part of the statute when it was first enacted in 1991. Most notably, section 227(b) prohibits using autodialer or robocall technology "to make any call … to any telephone number assigned to a paging service." 47 U.S.C. § 227(b)(1)(A)(iii). A typical paging device in the early 1990s would have displayed an incoming message as written text—usually displaying a phone number to call.[3] So the use of the word "call" in connection with pagers in section 227(b) makes "clear that the term 'call' cannot invoke only the common usage … in

---

[3] See, e.g., Paging Network, Inc., Annual Report, at 8 (1991), https://digital.library.mcgill.ca/images/hrcorpreports/pdfs/6/639549.pdf (noting that 92 percent of the company's pagers could "transmit a numeric message such as a telephone or account number to the subscriber").

which a 'call' refers to oral communication between two parties via telephone." *Lozano*, 702 F. Supp. 2d at 1005; *see also Abbas v. Selling Source, LLC*, 2009 WL 4884471, at *4 (N.D. Ill. 2009). Both the FCC and courts have therefore long held that section 227(b)'s autodialer protections apply to texts as well as traditional voice calls. *E.g.*, *Lozano*, 702 F. Supp. 2d at 1003–09.[4]

Indeed, the FCC determined as early as 2003 that, when the TCPA says "call," it must mean not just traditional voice calls but also modern text messages. 18 FCC Rcd. 14115 ¶ 165 (2003). As the FCC recognized then, the statutory text "encompasses both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls." *Id.* The FCC has consistently adhered to that position ever since. *See* 30 FCC Rcd. 7961, 8020 ¶¶ 115–16 (2015); *In re: Hernandez*, 2018 WL 6830220, at *1 ¶ 3 (Dec. 21, 2018); 88 Fed. Reg. 20800, 20802 ¶ 6 (Apr. 7, 2023); 38 FCC Rcd. 12247, 12256–57 ¶ 26 (2023).

Although it is only briefly discussed in the relevant order, the FCC's initial interpretation of the word "call" to include texts in 2003 is especially helpful to understanding the word's original meaning as of 1991. *See* 18 FCC Rcd. 14115 ¶ 165 (2003). When Congress originally drafted the TCPA, text messages didn't exist. *See Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 370 (6th Cir. 2015); *Medvidi*, 2025 WL 2856295, at *2. And texting didn't achieve widespead popularity until the 2000s.[5] So the FCC's understanding of "call" in 2003 surely approximated its 1991 meaning more closely than our 2025 intuitions, which reflect a world

---

[4] See also, e.g., 38 FCC Rcd. 12247, 12256–57 ¶ 26 (2023); 18 FCC Rcd. 14115 ¶ 165 (2003); Satterfield, 569 F.3d at 952–54; Gager v. Dell Fin. Servs., LLC, 727 F.3d 265, 269 n.2 (3d Cir. 2013); Keating v. Peterson's Nelnet, LLC, 615 F. App'x 365, 370–71 (6th Cir. 2015); Hudson v. Palm Beach Tan, Inc., 2024 WL 4190513, at *7 n.6 (M.D.N.C. 2024) ("Courts have routinely found that the phrase 'call' in subsection (b) of the statute includes text messages.").
[5] See, e.g., David Crystal, Txtng: The Gr8 Db8 11 (2008) ("The average number of texts per GSM customer in 1995 was 0.4 per month; by the end of 2000 it was still only 35.").

where texting has been ubiquitous for decades. *Cf. Loper Bright Enters. v. Raimondo*, 603 U.S.
369, 386 (2024) ("the contemporaneous construction of those who were called upon to act under
the law, and were appointed to carry its provisions into effect, is entitled to very great respect").

The FCC's conclusion that "the term 'call' includes a text message" therefore reflects
"the plain meaning of the statutory text as it has been understood by consumers, the FCC, and
courts since the TCPA's passage." *Medvidi*, 2025 WL 2856295, at *3.

### a. That interpretation of the word "call" aligns section 227(c)'s private right of action with its substantive provisions.

Defendant's argument hinges on the single use of the word the "call" in section
227(c)(5). But reading section 227(c)(5)'s private right of action in context with the substantive
Do Not Call List provisions elsewhere in section 227(c) provides additional confirmation that
text messages are covered.

To see why, start with what is the core of section 227(c)—its prohibition on "making or
transmitting a telephone solicitation to the telephone number of any subscriber" on the Do Not
Call List. 47 U.S.C. § 227(c)(3)(F). Text messages, of course, are communications "ma[de] or
transmitt[ed]" to a "telephone number." *Id.* And it is well-established that the residential
telephone "subscriber[s]" protected by the Do Not Call List include cell phone subscribers. The
FCC determined that cell phone subscribers are covered when it first created the Do Not Call
List regulations. *See* 18 FCC Rcd. 14014, 14037–38 ¶¶ 33–36 (2003). And courts have
overwhelmingly agreed with that interpretation of the statute ever since. *See, e.g.*, *Harriel v.
Bealls, Inc.*, 2025 WL 2379617, at *2 (M.D. Fla. 2025); *Cacho v. McCarthy & Kelly LLP*, 739 F.
Supp. 3d 195, 203 & n.4 (S.D.N.Y. 2024) (collecting cases).

The term "telephone solicitation" also clearly encompasses text messages. The statute expressly defines a "telephone solicitation" to mean "a telephone *call or message* … which is transmitted to any person" for commercial purposes, with certain exceptions not relevant here. 47 U.S.C. § 227(a)(4) (emphasis added). A text message, no less than a voice call, can be "transmitted." *See, e.g.*, *Transmit*, Webster's New Collegiate Dictionary (9th ed. 1991) ("to send out (a signal) either by radio waves or over a wire"). And the "telephone solicitation" definition's reference to a "call or message" covers texts even more clearly than the word "call" standing alone.

More generally, the definition of "telephone solicitation" focuses not on a communication's form but on whether it has "the purpose of encouraging" various kinds of commercial transactions. 47 U.S.C. § 227(a)(4); *see, e.g.*, *Hulce v. Zipongo Inc.*, 132 F.4th 493 (7th Cir. 2025) (Do Not Call List liability turned on whether a text message had the requisite commercial purpose). At the same time, the statute uses broad and inclusive language to describe the myriad ways such a communication might be conveyed—the FCC is directed to prohibit "making *or* transmitting" a telephone solicitation to "any" listed number, and a telephone solicitation is a "call *or* message" that is "transmitted to *any* person." 47 U.S.C. § 227(a)(4), (c)(3)(F) (emphases added). The statutory definition of "telephone solicitation" therefore "makes clear that Congress was more concerned with the purpose of the telephone communications it proscribed in the TCPA than the form in which those communications are transmitted." *Medvidi*, 2025 WL 2856295, at *3.

Finally, the purpose of the Do Not Call List provisions further supports that interpretation. Congress's stated goal was "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1).

And "a voice message or a text message are not distinguishable in terms of being an invasion of privacy." *Satterfield*, 569 F.3d at 954; *see also Medvidi*, 2025 WL 2856295, at *3; *Wilson v. Skopos Fin., LLC*, 2025 WL 2029274, at *4 (D. Or. 2025). Indeed, nothing in the statute gives any suggestion that Congress thought "oral messages were more invasive or objectionable than written ones." *Medvidi*, 2025 WL 2856295, at *3.

### b. Defendant's attempt to push a narrower interpretation is unpersuasive.

Defendant would have this Court interpret the Do Not Call List provisions more narrowly, insisting that the word "call" in section 227(c)(5) can only mean "voice call," and therefore the statute categorically excludes text messages. Its arguments mainly rely on two recent district court cases, *Jones v. Blackstone Medical Services*, 2025 WL 2042764 (C.D. Ill. 2025), but that is an non-persuasive outlier.

Consider first how Defendant reads the word "call" in section 227(c)(5). It repeats a few basic arguments for reading that word as implicitly limited to voice calls. But all of them go about interpreting the statute wrong.

First, Defendant insists that call cannot encompass text messages because text messaging was not an available technology in 1991. *Jones*, 2025 WL 2042764, at *4. However, that's not how statutory interpretation works. Of course, text messaging did not exist in 1991, so Congress didn't have it specifically in mind. *See Medvidi*, 2025 WL 2856295, at *2. But it is black-letter law that statutes are not "confined to the particular applications contemplated by the legislators." *Diamond v. Chakrabarty*, 447 U.S. 303, 315 (1980); *see also, e.g.*, *Hively v. Ivy Tech Cmty. Coll.*, 853 F.3d 339, 344–45 (7th Cir. 2017) (en banc). Instead, "statutes must be permitted to apply to technologies not in existence when a statute was drafted." *Lozano*, 702 F. Supp. 3d at 1008 (citing *Squillacote v. United States*, 739 F.2d 1208, 1213 (7th Cir. 1984)).

11

Indeed, "[w]hile every statute's *meaning* is fixed at the time of enactment," it is commonplace that "new *applications* may arise in light of changes in the world." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018). That's why, for example, "a 1925 statute dealing with 'news media' … appl[ies] to television." *Squillacote*, 739 F.2d at 1213. Or why a 1991 law that said "no vehicles in the park" would prohibit Cybertrucks and Priuses, not just Mustangs and Corollas. *See id.* (similar example with Volkswagens). The same is true here. "In determining whether section 227(c) applies to text messages, the Court looks to the plain meaning of the text rather than the specific facts or technology that Congress may have had in mind in 1991 at the time of the TCPA's passage." *Medvidi*, 2025 WL 2856295, at *2. In other words, the 1991 meaning of the word "call," which "refers to both oral and written communications," is what matters. *Id.*; *see Lozano*, 702 F. Supp. 2d at 1007. And that remains true even if text messages were not the "particular manifestation of [the] problem" that Congress had front of mind at the time. *Nat'l Cable & Telecom Ass'n v. FCC*, 567 F.3d 659, 665 (D.C. Cir. 2009); *see Diamond*, 447 U.S. at 315; *Hively*, 853 F.3d at 344–45.

Simply put, this is not a case where the Court needs to supplant or alter plain language" in order to "encompass new technologies. The plain meaning of the statute Congress used in 1991 already covers modern text messages.

*Jones* found it impossible to read "call" in anything but the familiar colloquial sense, and so concluded that the analysis ends there.[6] No doubt most people wouldn't use the word "call" the way the TCPA does in casual conversation, especially nowadays. In 2025, text messages are ubiquitous, and society has developed a whole vocabulary around them—think "emoji," "group

---

[6] Jones, 2025 WL 2042764, at *4 ("[I]n today's American parlance, 'telephone call' means something entirely different from 'text message.' Thus, under a plain reading, section 227(c)(5) of the TCPA does not regulate text messages.").

chat," "read receipt," and so forth. As part of that texting-specific lexicon, we have become very accustomed to saying "text message" or just "text" to describe written messaging between phones.

But statutory interpretation does not turn on modern colloquial usage. If anything, when language has evolved since a statute's enactment, current linguistic intuitions may be affirmatively misleading. For example, in *New Prime, Inc. v. Oliveira*, the Supreme Court explained that the statutory term "contracts of employment" in the Federal Arbitration Act "might call to mind only agreements between employers and employees" today, and thus exclude independent contractors. 586 U.S. 105, 114 (2019). But that "modern intuition" did not match the "evidence of the term's meaning at the time of the Act's adoption," which revealed that "'contract of employment' usually meant nothing more than an agreement to perform work." *Id*. The Supreme Court therefore held that the statutory exception at issue reached not just conventional "employees," as modern parlance might suggest, but also modern independent contractors, as contemporary definitions suggested. *See id.* at 114–16. In other words, when a mismatch arises between contemporary intuitions and the original meaning at the time of enactment, it is the latter that controls—not "today's American parlance," *Jones*, 2025 WL 2042764, at *4.

Defendant's interpretation fares no better when it comes to the broader statutory context in which the word "call" in section 227(c)(5) appears. Indeed, Defendant barely engages with the substantive Do Not Call List provisions of the statute in the remainder of section 227(c). When it does, it seems to take the position that text messages are neither calls *nor* messages, and thus don't fall within the statutory definition of a "telephone solicitation" at all. That's wrong. *See*

*supra*. That argument is little more than a repackaging of the company's erroneous view that Congress could not possibly have drafted the statute to cover text messages before they existed.

That reading of the statute doesn't make sense either. Neither does Defendant identify any reason Congress would have intended that odd result. And the text of section 227(c)(5) suggests otherwise—first, by being much more explicit about different ways that the private right of action actually is limited (requiring "more than one" call "in any twelve-month period"); and, second, by linking the private right of action to "violation of the regulations" (not any particular subset thereof). The latter suggests that section 227(c)(5) is simply "a straightforward provision designed to achieve a straightforward result"—making violations of the FCC's rules actionable. *See Krakauer*, 925 F.3d at 650.

Moreover, if Congress wanted to limit *only* the private right of action in section 227(c)(5) to voice communications, implicitly doing so through the word "call" would have been a strange way to go about it. After all, the word "call" clearly *does* include textual communications as that word is used in section 227(b). If Congress intended to cabin section 227(c)(5)'s private right of action to *exclude* text messages, it wouldn't have conveyed that by using a term that in section 227(b) *includes* them.

Because it's doubtful that Congress intended section 227(c)(5) to have a narrower scope than the Do Not Call List regulations it exists to enforce, the much better reading of "call or message" in section 227(a)(4) is that it instead signals Congress's intent to inclusively define the kinds of "telephone solicitations" that can be prohibited. *See Medvidi*, 2025 WL 2856295, at *3 ("This language makes clear that Congress was more concerned with the purpose of the telephone communications it proscribed in the TCPA than the form in which those communications are transmitted.").

Defendant also has no good answer for nearby uses of the word "call" in section 227(b), the autodialer provisions of the original TCPA.

As explained above, the word "call" in that context clearly covers text messages, because it is used to describe a (typically text-focused) transmission to a "paging service." *Id.* § 227(b)(1)(A)(iii); *see supra*, Part I.A. Defendant and the two decisions it cites therefore cannot, and do not, dispute that the broad consensus that the word "call" includes text messages as it is used in the autodialer provisions. Instead, all they can say is that section 227(b) is a "different provision" that could be "arguably broader" than section 227(c). MTD at 2, 7; *see also Jones*, 2025 WL 2042764, at *4–5; *Davis*, 2025 2491195, at *2.

What's missing, however, is any credible reason to think that the word "call" *actually does* mean something broader in section 227(b) than it does in section 227(c). Unless there's a sound reason to think otherwise, a statutory term is presumed to have a consistent meaning throughout a statute. *See Henson*, 582 U.S. at 85. Defendant identifies no reason why the meaning of "call" would differ between the two provisions. Nor does *Jones*. And the only possible distinction *Davis* can muster is to point out that 227(b) says it's unlawful to "to make any call" to various kinds of devices using an autodialer, whereas section 227(c) refers to a prohibited "telephone call" (in section 227(c)(5)'s private right of action) or a telemarketing "telephone call or message" (in the definition of "telephone solicitation" in section 227(a)(4)). But it's not clear why the addition or the subtraction of the modifier "telephone" would have any bearing on the question. Defendant hasn't disputed that a text is a "telephone" communication; of course it is. And whatever work "any" might be doing in section 227(b)(1)(A), *Davis* does not account for similarly broad and inclusive terminology in section 227(c), such as requiring the FCC to "prohibit *any* person from making *or transmitting* a telephone solicitation to the

telephone number of *any* subscriber included" in the Do Not Call List. 47 U.S.C. § 227(c)(3)(F) (emphases added).

To the contrary, reading the word "call" differently in section 227(c)(5) than in neighboring provisions would make no sense. As the FCC recently explained, it would be "anomalous" to give the word "call" a narrower meaning in section 227(c)(5) than it has elsewhere in the TCPA. 38 FCC Rcd. at 12257 ¶ 27. And, again, Congress would not have *excluded* text messages in section 227(c)(5) by using a term that elsewhere in the statute *includes* them. *See supra*, Part I.C.2.a.

## II. Any doubt that section 227(c) covers text messages should be resolved by deference to the FCC's longstanding interpretation.

The best reading of the statute is that the word "call" includes texts. But if the language of the statute leaves the status of texts unresolved, that's because Congress expressly delegated authority to the FCC to "fill up the details" of the Do Not Call List rules. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). As at least one other court has held post-*Loper Bright*, section 227(c) "explicitly delegates such authority." *Wilson v. Skopos Fin., LLC*, 2025 WL 2029274, at *4 (D. Or. 2025). So the FCC's longstanding and reasonable interpretation of the word "call" should still carry the day. *See id.*

To be sure, mere statutory ambiguity is no longer automatic cause to defer to an agency. *See Loper Bright*, 603 U.S. at 412–13 (overruling *Chevron*). And district courts are not bound by the Hobbs Act to apply FCC interpretations; they can and should begin by making their own assessment of what the TCPA means. *See McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 152 (2025). Defendant says this means no deference is owed, so courts can

now ignore the FCC's longstanding interpretation, and act as if no agency were involved. But that's incorrect.

Sometimes "the best reading of a statute is that it delegates discretionary authority to an agency." *Loper Bright*, 603 U.S. at 395. Courts thus still afford deference to agency interpretations when a statute "expressly delegate[s] to an agency the authority to give meaning to a particular statutory term," tasks an agency "to fill up the details of a statutory scheme," or tells an agency "to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility." *Id*. In that case, a court's role is merely to "fix[] the boundaries" of agency authority and ensure "reasoned decisionmaking" within them. *Id.*; *see Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575, 587–88 (6th Cir. 2025).

Section 227(c) is an express delegation of that sort. In the TCPA's Do Not Call List provisions, Congress didn't write the rules itself. Instead, it tasked the FCC with evaluating alternative approaches based on (among other things) their "effectiveness in protecting … privacy rights" and their "other advantages and disadvantages." 47 U.S.C. § 227(c)(1)(A). And it empowered the FCC to make rules "that *the Commission determines* are most effective and efficient to accomplish the purposes of this section." 47 U.S.C. § 227(c)(1)(E) (emphasis added). That language grants discretionary authority to "fill up the details," and uses open-ended language that bestows "flexibility" to best effectuate the TCPA's goals. *Loper Bright*, 603 U.S. at 395. In the telecommunications context, especially, an express delegation like this one is evidence that Congress expected technology "to evolve and therefore charged the [FCC] with the continuing obligation to define it." *See U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 718 (D.C. Cir. 2016). It follows that, if the statute itself doesn't resolve this question, Congress expected that the FCC would.

It therefore would honor Congress's intent here to "respect [that] delegation" and affirm the FCC's "reasoned decisionmaking" on this question. *Loper Bright*, 603 U.S. at 395.

Exercising its expressly delegated authority, the FCC has reasonably explained that prohibiting texts to numbers on the Do Not Call List "make[s] … enforcement easier" and "eliminate[s] any potential confusion in the industry." 38 FCC Rcd. 12256–57 ¶¶ 26–27. That conclusion also aligns with the FCC's determination that cell phone numbers are eligible for protection, and that the statute's use of the word "call" confers protection from unwanted text messages in other TCPA contexts. 38 FCC Rcd. 12256–57 ¶¶ 26–27. And that reasonable interpretation of the word "call" is one that the FCC has consistently adhered to for more than two decades, dating back to the earliest years of the technology, when text messaging first became common. *See* 18 FCC Rcd. 14014, 14115 ¶ 165 (2003); 30 FCC Rcd. 7961, 8020 ¶¶ 115–16 (2015); *In re: Hernandez*, 2018 WL 6830220, at *1 ¶ 3 (Dec. 21, 2018).

The FCC's conclusion that text messages are "calls" and that its Do Not Call List rules therefore have the same scope as other TCPA protections is "reasonable and reasonably explained." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1511 (2025). Indeed, when *Chevron* was the deference regime that governed, courts often deferred to the FCC's judgment about the meaning of "call" in the TCPA upon finding it to be reasonable. *See, e.g.*, *Satterfield*, 569 F.3d at 954 (granting the FCC *Chevron* "deference to hold that a text message is a 'call' within the TCPA"); *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265 (3d Cir. 2013) (similar). After *Loper Bright*, there are many cases where agencies' reasonable decisions are no longer entitled to deference, but this is not one of them. The FCC's judgment about the status of text messages under its rules remains within authority that the TCPA "explicitly delegates" to the agency, and it remains reasonable—so it remains worthy of deference. *Skopos*

*Fin.*, 2025 WL 2029274, at *4; *see also Barton v. Delfgauw*, 2025 WL 2402131, at *3 n.1 (W.D. Wash. 2025) (after *Loper Bright*, continuing to apply *Satterfield*'s conclusion that the FCC's judgment is entitled to deference).

Alternatively, the FCC's interpretation is—at the very least—an "informed judgment" that should be accorded "great weight." *Loper Bright*, 603 U.S. at 388 (citing *Skidmore v. Swift Co.*, 323 U.S. 134, 139–40 (1944)). The FCC's position is grounded in the agency's expertise, consistent across decades, and well-reasoned. Those are the hallmarks of agency action with "the power to persuade." *Id.*; *Skidmore*, 323 U.S. at 140. The FCC's longstanding and consistent interpretation of the word "call" is thus an "informed judgment" to which this Court can "properly resort for guidance." *Loper Bright*, 603 U.S. at 388; *see Medvidi*, 2025 WL 2856295, at *3 (accepting the FCC's interpretation that "the term 'call' includes a text message" as evidence of "the plain meaning of the statutory text as it has been understood by consumers, the FCC, and courts since the TCPA's passage").[7]

### III. The Defendant did not have consent and the communications were unlawful telephone solicitations.

Defendant's arguments that Plaintiff "consented" to receive messages and that the communications were not "telephone solicitations" both fail under the Complaint's well-pleaded facts and the governing law.

Defendant's primary theory of consent rests on a line of text that appears only in its own outgoing message—"Thanks for opting in to receive sms messages." But that language

---

[7] Even apart from the statute's text and structure, the FCC's 2023 rule reaffirming that Do Not Call protections extend to text messages would readily survive review under the Administrative Procedure Act. See 38 FCC Rcd. 12247, 12256–57 ¶¶ 26–27 (2023) (reasonably explaining that including texts prevents loopholes and aligns with Congress's privacy purpose).

originates from Defendant, not from Plaintiff. A telemarketer cannot establish "prior express invitation or permission" simply by inserting an "opt-in" statement into its own promotional text and then asserting consent from its self-authored content. At this stage, the Court must accept Plaintiff's allegations that she never consented as true. Plaintiff specifically alleges she "did not give Defendant prior express consent or permission to call" and "did not request information or promotional materials from Defendant." (ECF No. 1 ¶¶ 25–26.)

The surrounding circumstances eliminate any plausible inference of consent. Plaintiff was called three times in less than ten minutes on May 1, 2025. During the second call, she explicitly instructed Defendant not to call her again, yet Defendant placed a third call minutes later, during which a live representative offered to "help reduce and consolidate" Plaintiff's debt and identified himself as calling from "Debt Advisors of America." (Id. ¶¶ 18–19.) That immediate disregard of a "do not call" request demonstrates the opposite of consent and underscores both willfulness and the need for injunctive relief.

The content and purpose of the communications also make clear they were telephone solicitations within the meaning of 47 U.S.C. § 227(a)(4). That provision defines a "telephone solicitation" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." The calls and texts easily meet that definition. The live representative's offer to help "reduce and consolidate debt" was a direct sales pitch for Defendant's services, and the follow-up text messages identified "Debt Advisors of America," provided the representative's contact information, and encouraged further engagement. (Id. ¶¶ 19–20.) Plaintiff further alleges that all of the communications were "made for the purpose of advertising and marketing Defendant's business or services." (Id. ¶¶ 21–24.) Even if Defendant's argument focused solely on text messages, the three calls alone—placed to a

DNC-registered number, promoting Defendant's debt-relief business, and made after Plaintiff expressly declined further contact—plainly qualify as prohibited telephone solicitations under § 227(c). (Id. ¶¶ 12, 16–21, 25–26.)

At bottom, the Complaint alleges that Defendant initiated or caused to be initiated repeated, unsolicited, and unwanted telemarketing communications for a commercial purpose, after being told to stop. Those allegations defeat both Defendant's consent argument and its contention that the communications were not "telephone solicitations" within the meaning of the TCPA.

## IV.     The Plaintiff has plainly alleged that contact was from the Defendant.

Even assuming arguendo that texts messages did not count, Plaintiff's claim still clears Rule 12(b)(6) because the Complaint alleges three telemarketing calls in a single day to a number long registered on the National Do Not Call Registry ("DNC"). On May 1, 2025, Plaintiff received three calls at 10:14 a.m., 10:15 a.m., and 10:23 a.m., from caller ID (815) 634-1071. She answered two of those calls; during the second call she told the caller not to call again, and during the third call a live representative identified "Debt Advisors of America" and offered to help reduce and consolidate Plaintiff's debt. (ECF No. 1 ¶¶ 16–19). These calls were made for the purpose of advertising and marketing Defendant's services (id. ¶¶ 21–24 to a number registered on the DNC since 2005 (id. ¶ 12).

Defendant's bid to avoid responsibility by claiming it did not "directly" make the texts misstates both the law and the pleadings. Plaintiff alleges that the live representative she spoke to on May 1, 2025 "identified Debt Advisors of America as the company he was contacting Plaintiff from" and "offered to help reduce and consolidate her debt" (ECF No. 1 ¶ 19). That direct identification of the company's name and services ties the calls squarely to Defendant. In

addition, Plaintiff received two text messages from number (858) 365-3349—an area code assigned to Defendant's headquarters in San Diego—each explicitly naming "Debt Advisors of America" and providing contact information for the same representative (ECF No. 1 ¶ 20). The texts arrived within hours of the calls, thanked Plaintiff "for opting in," and promoted the same debt-relief services discussed in the earlier calls. This consistent branding and continuity of communication demonstrate that the same entity initiated or authorized the entire campaign.

Where a telemarketing communication identifies a seller by name and seeks to induce the recipient to purchase that very seller's goods or services, courts infer on the pleadings that the seller either made the call/text or "caused it to be made" and is therefore directly accountable. *See Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1008–09 (N.D. Ill. 2010) (treating promotional texts as actionable "calls" attributable to the promoting entity). "At first glance, these allegations seem like a strong basis for attributing the … [calls and text] to the Defendant. After all, when a person introduces herself across the table as Olivia or Emma --- we generally conclude without much hesitation that is indeed who she is." *See Bradshaw v. CHW Grp., Inc.*, No. 24-cv-00114 (MEF)(JBC), 2025 U.S. Dist. LEXIS 13649, at *5-6 (D.N.J. Jan. 24, 2025) ("So too as to the December 8 call. The caller allegedly introduced herself as 'Erica . . . from the Defendant.' Why then would it not be plausible to conclude that she was, in fact, 'Erica . . . from the Defendant'?").

"The logic of this approach is reflected in the decisions of any number of federal courts. *See, e.g., Marks v. Unique Lifestyle Vacations, LLC*, 2024 U.S. Dist. LEXIS 41804, 2024 WL 1051974, at *3 (E.D. Pa. Mar. 11, 2024); *Katz v. CHW Grp., Inc.*, 2023 U.S. Dist. LEXIS 176206, 2023 WL 6445798, at *4 (W.D. Ark. Sept. 29, 2023); *Smith v. Am.-Amicable Life Ins. Co.*, 2022 U.S. Dist. LEXIS 62115, 2022 WL 1003762, at *2 (E.D. Pa. Apr. 4, 2022); *Adam*

*v. CHW Grp., Inc.*, 2021 U.S. Dist. LEXIS 170620, 2021 WL 7285905, at *5 (N.D. Iowa Sept. 9, 2021)." *Id.*; *accord Taylor v. Suntuity Solar L.L.C.*, No. 8:23-cv-00694-MSS-AEP, 2024 U.S. Dist. LEXIS 38838, at *15-16 (M.D. Fla. Mar. 6, 2024) ("Plaintiff's allegations are sufficient to plead a claim for Defendant's direct liability under the TCPA at this stage. Plaintiff alleges Defendant initiated the telemarketing calls. Specifically, Plaintiff alleges, 'The Plaintiff received calls from Suntuity Solar on at least January 31 and February 8, 2023.' Plaintiff further alleges: 'During both calls, Plaintiff was initially provided a generic, fake name, "solar of America."' 'The only real company identified during the calls was Suntuity.'" (cleaned up)); *Stemke v. Marc Jones Constr., LLC*, No. 5:21-cv-274-30PRL, 2021 U.S. Dist. LEXIS 181916, at *6-7 (M.D. Fla. Sep. 23, 2021) ("Sunpro's motion to dismiss goes beyond the pleading to challenge the merits of the alleged facts. Indeed, the crux of Sunpro's motion questions Plaintiff's allegations that Sunpro placed the subject calls. For example, Sunpro argues that Plaintiff fails to 'support' a plausible inference that Sunpro is directly or vicariously liable for the calls Plaintiff received because she does not allege facts that associate Sunpro to the calls allegedly at issue. But a review of the Amended Complaint belies this argument—Plaintiff alleges several times that she or her attorneys confirmed that Sunpro placed the subject calls. Plaintiff even includes the phone numbers and the dates she received the calls."); *see also Slominski v. Globe Life Inc.*, No. 7:23-CV-1081-D, 2024 U.S. Dist. LEXIS 24378, at *15 (E.D.N.C. Feb. 12, 2024) ("Slominski alleges that on March 14 and March 15, 2023, she received calls and voicemail messages on her cell phone that asked her to call Globe. The voicemail messages concerned 'an insurance plan.' Globe sells insurance plans. … Defendants contend Slominski fails to plausibly attribute the alleged prerecorded voicemail messages to Globe. Slominski, however, plausibly alleges enough information about the contents of the

voicemail messages she received on March 14 and March 15, 2023, to survive a motion to dismiss." (cleaned up)).

The Complaint describes a series of events—not isolated occurrences. Plaintiff received three back-to-back calls within nine minutes, followed almost immediately by confirming text messages (ECF No. 1 ¶¶ 16–20). Each communication referenced Defendant's debt-relief services and emanated from numbers linked to its business location. That timing and uniformity support the reasonable inference that Defendant delivered the calls and texts as part of a single marketing operation. Defendant's reliance on decisions dismissing threadbare TCPA pleadings is misplaced. In *Woodard v. Health Insurance Alliance*, the complaint merely alleged that "defendant or its agents" placed calls without identifying any connection to the named defendant. Here, by contrast, Plaintiff pleads (1) that Defendant was identified by name during live calls, (2) that the caller offered services uniquely tied to Defendant's business model, (3) that follow-up texts bore Defendant's name and contact details, and (4) that all communications occurred on the same day from numbers traceable to Defendant's geographic area. Those facts distinguish this case from the "bare allegations" in the authorities Defendant cites.

Defendant also misreads *Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354 (7th Cir. 2020), where the Seventh Circuit affirmed dismissal because the complaint alleged only that a wireless carrier—not Subway—sent the message. In contrast, Plaintiff's allegations directly identify Defendant as the source of both the calls and texts. Far from being speculative, her allegations are based on her firsthand interactions with Defendant's representative.

## V.    The Plaintiff is allowed to pursue her claim for injunctive relief

"The Supreme Court has recognized that when the time frame for the alleged injury is by nature temporary, a named plaintiff can continue to pursue the interests of the class even after his

own claim has been rendered moot. Otherwise, a defendant could evade prospective injunctive relief simply by inflicting harms that are too transitory to last the length of an entire lawsuit or, in this case, by ceasing the alleged violations with respect to plaintiffs who step forward." *Snyder v. Ocwen Loan Servicing, LLC*, 258 F. Supp. 3d 893, 901 (N.D. Ill. 2017) (citation omitted). Accordingly, the *Snyder* court rejected the argument that a plaintiff cannot pursue injunctive relief for a class once he stops receiving calls:

> If this were sufficient to defeat standing, Ocwen would be able to cease calls to any individual the instant he joined the case as a named plaintiff and thereby indefinitely avoid injunctive relief, while keeping the allegedly unlawful practices in effect. A defendant's choice to end the challenged behavior— where he remains free to resume the unlawful conduct at any time—is insufficient to render plaintiff's claim moot.

*Id.* at 901 (citation omitted). Thus, Plaintiff need not allege that she continues to receive calls and this Court should hold the same.

### Conclusion

Defendant's motion fails under any path the Court chooses. The Complaint plausibly alleges that Plaintiff's DNC-registered number received three telemarketing calls in a single day from Defendant—including a live pitch for Defendant's debt-resolution services minutes after Plaintiff said "do not call"—which independently satisfies § 227(c)(5) even without counting the texts. (ECF No. 1 ¶¶ 12, 16–21, 25–26.) It also plausibly alleges that the texts and calls were "telephone solicitations" and that Plaintiff never provided prior express invitation or permission. (Id. ¶¶ 19–26.) And because § 227(c)(5) expressly authorizes injunctive relief—and the pleaded facts show an ongoing practice and immediate disregard of a stop request—Plaintiff's prayer for an injunction should proceed.

Dated: November 2, 2025        PLAINTIFF, individually and
on behalf of others similarly situated,

By:

*/s/ Anthony I. Paronich*
Anthony I. Paronich
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(508) 221-1510
anthony@paronichlaw.com